**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**BRITTANY PITTS**,

       Plaintiff,

vs.                                                    **CASE NO. 5:07cv169-RS-EMT**

**JOSEPH R. FRANCIS**; **MRA
HOLDING, LLC**, a California Limited
Liability Company; and **MANTRA
FILMS, INC.**, an Oklahoma Corporation,

       Defendants.

_____/

**<u>ORDER ON MOTION TO DISQUALIFY OR RECUSE</u>**

     Before me is Defendants' Motion to Disqualify or Recuse Under 28 U.S.C. § 455(a) (Docs. 11 & 20).  Plaintiff opposes the motion (Docs. 16, 22 & 24).

## I.  Background

     Plaintiff Brittany Pitts has sued Defendant Joseph R. Francis and Defendant business entities operating under the name "Girls Gone Wild."  Pitts alleges that in April 2003, while on her spring break vacation in Panama City Beach, Florida, Francis and another Girls Gone Wild employee approached her on the beach and coerced her into exposing her breasts on film.  Pitts contends that she did not consent to be filmed and was sixteen years of age, a sophomore in high school, at the time of the alleged incident.  Pitts' image was displayed on the cover of a Girls

Gone Wild video and DVD, which were sold and distributed throughout the United States.  The five-count First Amended Complaint asserts claims for unjust enrichment; violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 *et seq*.; unauthorized publication of likeness under Fla. Stat. § 540.08; commercial misappropriation of one's likeness; and false light doctrine of invasion of privacy (Am. Compl., Doc. 15.)

The motion requests that I disqualify or recuse myself from this case under 28 U.S.C. § 455(a)[1].  Defendants contend that my impartiality in this case might be questioned based on the history of civil and criminal proceedings involving Defendants and a former Girls Gone Wild cameraman over which I have presided. *See Doe v. Francis*, 5:03cv260-RS-WCS, (N.D. Fla. filed October 8, 2003); *United States v. Mantra Films, Inc.*, 5:06cr78-RS, (N.D. Fla. filed September 12, 2006); *United States v. Schmitz*, 5:06cr81-RS, (N.D. Fla. filed September 12, 2006).  As grounds for disqualification and/or recusal, Defendants contend that:

1.  I forced Francis to settle the civil lawsuit under the threat of incarceration;

2.  I would not consider "less onerous alternatives" other than incarceration to compel Francis' compliance with my order to mediate the civil lawsuit;

3.  I required that Francis personally attend a criminal sentencing hearing and read aloud a victim impact statement on behalf of his corporation, Mantra

---

[1]28 U.S.C. § 455(a) states, in relevant part, that "any judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Films, Inc., after the corporation pled guilty to committing federal crimes[2]; and

4.  I made various comments to Francis and to Mark Schmitz, a Girls Gone Wild cameraman, at judicial proceedings.  Defendants contend that the comments demonstrate bias and prejudice against them.  The comments are set forth and addressed in this opinion.

## II.  Analysis

### A.  *Preliminary Statements*

1. In my more than 34-year history as a trial attorney and judge, the pending motion to disqualify, filed by Joe Francis and Girls Gone Wild, is the first time that anyone represented by counsel has ever filed a motion questioning my ethics or moved to disqualify me from presiding over a case.  I have never had, nor do I currently harbor, any animosity, bias, or prejudice toward Joe Francis or Girls Gone Wild that would cause me to question my ability to fairly and impartially preside over this case.  I have no interest, personally, professionally, or politically, in the outcome of this or any other litigation involving Joe Francis and Girls Gone

---

[2]The crimes included:

(1) knowingly producing sexually explicit DVDs for which Mantra Films, Inc. failed to create and maintain individually identifiable age and identification records pertaining to every performer portrayed in the DVDs, in violation of 18 U.S.C. § 2257(f)(1); and

(2) knowingly selling sexually explicit DVDs which did not have affixed to them a statement describing where the required age documentation records for all performers depicted in the DVDs could be located, in violation of 18 U.S.C. § 2257(f)(4).

Wild other than to fulfill my sworn duties under the law.[3]  The fact that Joe Francis and Girls Gone Wild have filed a motion to disqualify me from this case does not, in any way, alter my ability to preside fairly, objectively, and impartially over this case.

 2.  Defendants emphasize that they are not contending that I am actually biased against Joe Francis or Girls Gone Wild[4]; rather, they contend that a reasonable, objective  person with knowledge of all facts would *perceive* me as biased.  Based on that representation, I question whether this Court may properly exercise jurisdiction over the motion.  If Joe Francis and Girls Gone Wild do not *themselves* perceive me as biased but contend only that the public or some hypothetical, non-existent individual who is not a party to the case perceives me as biased, I must find that Defendants lack standing to request my disqualification.

---

[3]28 U.S.C. § 453 states, in relevant part, that:

> Each judge of the United States shall take the following oath or affirmation before performing the duties of his office:
>
> "I do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States.  So help me God."

[4]Defendants state: "To clarify and restate the disqualification basis, Defendants do not seek to have this Court declare that it is biased and cannot be impartial in this matter.  Nor do Defendants claim that this Court has a personal bias against Defendants."  (Reply, Doc. 20-2, p. 2 at ¶ 4.)

*See Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315, 3324, 82 L. Ed. 2d 556,

569-70 (1984) (stating that the constitutional prerequisite of standing requires that

a movant allege *personal* injury that is "distinct and "palpable," not "abstract or

conjectural or hypothetical," and prohibits a litigant from raising another person's

legal rights).

  3. Defendants ignore the most relevant, objective evidence of a  reasonable

person's perception of my impartiality and lack of bias toward Joe Francis and

Girls Gone Wild:

   In the proceedings relating to Joe Francis and Girls Gone Wild over which I

have presided, Joe Francis and Girls Gone Wild were, at all times,  represented by

an entourage of private counsel.  Defendants cannot therefore complain that they

were not adequately represented in any of the proceedings before me.  In each

proceeding, counsel for Joe Francis and Girls Gone Wild did not object to; did not

appeal; or appealed the rulings and comments of which they now complain and

lost.  *See Doe v. Francis*, 5:03cv260-RS-WCS (N.D. Fla. 2007), *appeal docketed*,

No. 07-11513-C (11th Cir. April 11, 2007) (denying Francis' emergency motion to

stay my order finding him in civil contempt and ordering his incarceration); *Doe v.

Francis*, 5:03cv260-RS-WCS (N.D. Fla. 2007), *appeal docketed*, No. 07-11513-C

(11th Cir. June 4, 2007) (dismissing Francis' appeal for lack of jurisdiction); *Doe

v. Francis*, 5:03cv260-RS-WCS (N.D. Fla. 2007), *appeal docketed*, No. 07-11513-

C (11th Cir. August 1, 2007) (denying Francis' motion to reconsider Eleventh

Circuit's order dismissing his appeal for lack of jurisdiction); *United States v.

Mantra Films*, *Inc.*, 240 Fed. Appx. 372, 2007 WL 2509852 (11th Cir. September

6, 2007) (unpublished) (affirming my sentence requiring that Francis personally

perform community service on behalf of Mantra Films, Inc., after the corporation

pled guilty to having committed federal crimes).  I find it particularly disturbing that counsel for Defendants chose to omit this crucial, seemingly dispositive, information from the motion.

## B.  Purpose

Because the grounds asserted for my disqualification rely on past judicial proceedings unrelated to this case, I find it proper and necessary to revisit those proceedings in order to fully assess the merits of the motion:

### a. The History - *Doe v. Francis*

The pending motion is not the first time that Girls Gone Wild and its attorneys have made charges of unethical conduct against members of the bar and sought their disqualification.  In *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Girls Gone Wild and counsel then representing it levied charges of attorney misconduct at and moved to disqualify two experienced attorneys from representing the plaintiffs in that case.  *See Doe v. Francis*, Case No. 5:03cv260-RS-WCS (Doc. 123).  Plaintiffs' counsel had never before, in their combined 62 years of experience in the practice of law, been accused of ethical wrongdoing by motion filed in a court.  (Hr'g Tr., Doc. 170, p. 21, lines 21-25, p. 22, lines 1-3, p. 124, lines 3-8.)

Although the motion to disqualify in *Doe v. Francis* purported to allege instances of attorney misconduct, the bulk of the motion attacked the credibility of the *plaintiffs* instead, a tactic designed to poison the potential jury pool via the public dockets of this Court.  (Doc. 153, p. 3 at ¶ 2) (although the motion purported to allege instances of *attorney* misconduct, Defendants dedicated more than twice the amount of pages devoted to any single allegation of attorney misconduct, to attacking the credibility of the Plaintiffs *themselves*).  Exposing the motion in *Doe*

*v. Francis* for what it was – a "below-the-belt" cheap shot at plaintiffs and their attorneys – I wrote that:

> This Court is presented with a Motion filed by an attorney who accuses experienced members of the bar of wrongdoing; attacks the credibility of the Plaintiffs in a manner that is wholly irrelevant to the Motion; fails to explain and pursue several of the allegations; fails to inquire about and confirm the accuracy of many of his beliefs; calls no witnesses other than himself to support these beliefs; fails to report the alleged misconduct as required by the Florida Rules of Professional Conduct; delays 28 months in raising several of the alleged ethical violations; and requests no relief at the evidentiary hearing other than a "public airing" of his grievances.

(Doc. 153 at 5.)  Under the same "reasonable person" standard advocated by Defendants, I note that a reasonable person could well perceive the pending motion requesting my disqualification as simply an attempt by Joe Francis, Girls Gone Wild, and their counsel to broaden the campaign of ethical assaults on members of the bar to now include a member of the judiciary.

### b. The Present

Although Girls Gone Wild contends in the pending motion that I have improperly acquired extrajudicial knowledge about it that has resulted in bias against it, Girls Gone Wild incredibly attaches, as exhibits to the motion, the very same extrajudicial information – in the form of newspaper articles, an internet blog entry, and a law journal article – that it preaches is improper.   (See Mot., Doc. 11, Exs. 2-5.)  The motion then "warns" that "[o]ther public perceptions articles proliferate the Internet and may be submitted to this Court upon further review." (Mot., Doc. 11, p. 9 at n. 10.)

The extrajudicial exhibits, like the exhibits in the motion to disqualify in

*Doe v. Francis*, are wholly *irrelevant* to the merits of the motion.  The motion to disqualify, while accurately stating the law on disqualification and recusal at the outset, then distorts the law in an apparent effort to remove a lawsuit between private litigants from a court of law to a "court" of public opinion.

The motion begins by correctly quoting an Eleventh Circuit decision stating that a judge should recuse himself from a case when "an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." (Mot., Doc. 11, p. 10 at ¶ 22) (*quoting Bevan v. Durling*, Docket No. 06-14824, 2007 WL 1721460 at *1 (11th Cir. June 15, 2007) (unpublished)).  *See also Christo v. Padgett*, 223 F.3d 1324, 1333 (11th Cir. 2000), *cert. denied*, 531 U.S. 1191, 121 S. Ct. 1190, 149 L. Ed. 2d 106 (2001).  Although the Eleventh Circuit standard for recusal requires the judge to consider the perspective of an "objective, disinterested, lay observer fully informed of the facts," the motion then mutates the standard from one involving *objectivity*, *disinterest*, and *facts* to a contrived standard based on "public perception."   (Mot., Doc. 11, p.  9 at ¶ 19) ("Perception, sometimes, matters more than reality."); p. 11 at ¶ 27 ("What matters is not the reality of bias or prejudice, but the appearance thereof."); p. 16 at ¶ 46 ("the public opinion and understanding, whether correct or not, is that this Court told Joe Francis 'settle or go to jail.'"); p. 16 at ¶ 47 ("Perception is as important, when it comes to fair-minded justice, as reality.")

Nowhere does the motion cite or quote legal authority that "public perception" is a proper substitute for the test of "reasonableness" required for

disqualification.[5]  This is particularly true where, as here, Girls Gone Wild (1) makes no claim that *it* has adopted the perception of bias that it urges me to accept and (2) repeatedly states that public perception of bias, if it even exists, may be untethered to reality. (Mot., Doc. 11, p. 17 at ¶ 51) ("Even accepting that the bias and prejudice as perceived by public opinion *may not be reality* . . . ); p. 9 at ¶ 19 ("Perception, sometimes, *matters more than reality*."); p. 16 at ¶ 46 ("the public opinion and understanding, *whether correct or not*, is that this Court told Joe Francis 'settle or go to jail.'").

By contorting the objective, fact-based standard for disqualification and recusal into an artificial standard of "public perception,"  Defendants construct the legal scaffolding on which to hang their extrajudicial exhibits, all at the potential expense of the public's respect for the judiciary and this Court; the litigants' rights to receive a fair trial; and the Florida Rules of Professional Conduct.  *See* Fed. R. Civ. P. 11(b)(1) & (3) (prohibiting an attorney from filing documents in court for an improper purpose and without evidentiary support); N.D. Fla. Loc. R. 77.3(C) & Fla. R. Prof. Conduct 4-3.6 (prohibiting an attorney from making or participating in making extrajudicial statements that could prejudice a trial or adjudicative proceeding).

### C. The Merits

Even if I were to assume that "public perception" is a relevant consideration in assessing the merits of the pending motion, Defendants have failed to submit evidence that the public *does* indeed perceive me as biased against Joe Francis and

---

[5]The plain language of the statute under which Defendants request my disqualification, 28 U.S.C. § 455(a), like the case law on recusal, requires that a judge disqualify himself from a case only if his impartiality might be *reasonably* questioned.

Girls Gone Wild.[6]  None of the newspaper articles submitted by Defendants support their claim of bias.  The newspaper articles simply report, without editorial, opinion, or commentary, the civil and criminal proceedings relating to Joe Francis and Girls Gone Wild over which I have presided.

## 1.  Mediate in Good Faith, Not Settle or Jail

The single parcel of evidence submitted by Girls Gone Wild that *does* provide a relevant opinion of an objective observer's perception *contradicts* the perception of bias urged by Girls Gone Wild.  That evidence is a blog entry in the "Court of Public Opinion" section of the online version of the *Panama City News Herald* (*"News Herald"*).  The author of the blog entry, David Angier, wrote the "settle or jail" article that was originally published in the *News Herald* and which served as the basis for the inaccurate reports in the national media that I forced Joe Francis to settle the civil lawsuit or face imprisonment.  *See* David Angier, *Judge to Francis: Settle or Jail*, Panama City News Herald, March 31, 2007, at 1A-2A (Ex., Doc. 11-2.)  Angier stated in the blog entry that

> The judge said . . . that he did not order Francis to settle the federal lawsuit or go to jail.  ***That's very true***, but 'settle or jail' has become almost a catchphrase at this point that is perpetuating itself.  Even the *News Herald*'s Sunday op-ed page carried the ***misconception***.

David Angier, *Settle or Jail*, Panama City News Herald, April 9, 2007, at Court of Public Opinion (Ex., Doc. 11-3.)

In other words, the sole author of the "settle or jail" article admits that any

---

[6]Neither Defendants nor Plaintiff should interpret this finding as an invitation to scour popular culture and flood the dockets of this Court with extrajudicial information in support of or in opposition to my finding.

perception, if one does exist, that I required Joe Francis to settle or go to jail is a *misperception*.  Simply stated, my order did not require that Joe Francis settle the lawsuit; rather, it unambiguously required that Joe Francis *mediate* his case in good faith after I found him in civil contempt for exploiting a court-ordered mediation proceeding to threaten and abuse the other party in the civil lawsuit.

I can only assume that Angier, a non-attorney, misunderstood the difference between requiring a party to *settle* a case and requiring a party to *mediate* a case in good faith when he wrote the "settle or jail" article.  The quoted portion of the blog entry appears to have been an effort by Angier to correct the mistake.  Defendants even acknowledge Angier's error, though in a mere footnote:  "[T]he public perceptions and confusion have apparently caused the article itself to be removed from the *New* [sic] *Herald* web site archives at http://www.newsherald.com." (Mot., Doc. 11, p. 8 at n. 8.)

It is noteworthy that Defendants do not contend that they *themselves* interpreted my order as requiring that Joe Francis settle the case.  Unlike Angier, all parties present at the contempt hearing, including counsel for Joe Francis and Girls Gone Wild, *did* understand that my order required that Joe Francis simply mediate in good faith, not settle, the case:

> **THE COURT:**  Mr. Francis can cure his contempt and have this sanction of incarceration removed upon his proper participation in mediation.  And I direct that the plaintiffs are to cooperate in every possible way in expediting the scheduling of the resumption of the mediation.
>
> Whenever the mediation is due to start, I direct that everybody concerned are to arrive in Bay County no later than the evening before so that there will be no possibility, hopefully, of mediation not getting started on time.

It is in Mr. Francis' interest that this mediation be set up and accomplished as quickly as possible.

If necessary, this mediation could be conducted here in the courthouse and I will wait to hear from the attorneys about this offer. Regardless, I will be immediately available in the event any further problems arise.

Now, at the mediation, Mr. Francis will be dressed and groomed appropriately as if for the appearance before this court in this courtroom. This means a business suit and a tie, business shoes and socks and he will conduct himself and communicate in a manner during the mediation with the demeanor and courtesy expected in serious business transactions and appearances before this court.

I will emphasize again that this mediation is ordered as an activity of this court. Simply because we put it under the supervision of a neutral mediator does not remove it from the interest and control of the court.

Mr. Francis will be released from incarceration when the mediator certifies in person to me that Mr. Francis has fully complied with this order and has participated in the mediation in good faith.

Now, the further guidance is that there must – while mediation – this obligation to mediate does not impose an obligation to settle, there must be participation by all parties and the attorneys in a discussion – frank and thorough discussion – as stated in Local Rule 16.3. And that is to identify the interests that are at stake, to suggest alternatives, analyze the issues, question existing perceptions, to conduct private caucuses, to stimulate negotiations and to keep this thing under order.

. . .

> **THE COURT:** We are looking at this point, Mr. Francis, to do without reservation what my order, scheduling mediation order, required in the first instance. His conduct, which I think is not disputed – I don't know if I've been sufficiently articulate, but Mr. Burke, in all of my years of being a trial lawyer, and a mediator, and then – and as a mediator trying to keep up with the law and the guidance in Florida, the Dispute Resolution Center with the Florida Supreme Court, tried to keep all mediators involved of current issues – I can't think of any worse behavior anytime in my career. If necessary we'll take this a step at a time.

> . . .

> **MR. BURKE:** In light of the court's order, *which seems to be to be premised on the fact – on the finding that Mr. Francis did not meaningfully participate, or that the mediation was not conducted pursuant to the court's scheduling order in good faith*, I would like to proffer on behalf of the defendants, under seal, so that the matter may be reviewed by both – either Your Honor or by the court of appeal – the actual offers that were made at the mediation, *so that a court may consider whether in fact mediation proceeded in good faith* by the defendants and by Mr. Francis in particular.

(Hr'g Tr., *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 338, p. 90, lines 12-25, p. 91, lines 1-25, p. 101, lines 15-25, p. 102, lines 11-20.)

The quoted statements prove, beyond a reasonable doubt, that defense counsel correctly understood my order as requiring that Joe Francis mediate in good faith, not settle, the case. As specifically articulated on the record and as quoted verbatim above: "[T]his obligation to mediate does not impose an obligation to settle." (Doc. 338, p. 90 at lines 18-19.)

Assuming that defense counsel misconstrued the order as a requirement to

settle, defense counsel did not object to the order; did not seek clarification from
me that the order was an order to mediate, not an order to settle; and objectively
demonstrated, through conduct, that my order was a requirement to mediate
because Francis did, in fact, mediate with a  mediator by telephone following the
hearing.  Had Francis and defense counsel interpreted my order as a requirement to
settle, they presumably would not have made the effort to contact and enter into
discussions with a mediator following the hearing.  Based on this overwhelming
evidence, I find that a reasonable person would not only reject Defendants'
argument of perceived bias as it relates to the "settle or jail" article but would also
*question* Defendants' underlying purpose in republishing, via this Court's public
dockets, a story they *know* to be false.

      The motion improperly truncates and mischaracterizes my instruction to
mediate when it asserts:

> c. Moreover, this Court advised the parties that they were
> to "resolve" this matter.  When questioned by counsel for
> the defendant as to the definition of resolving this matter,
> the Court advised, 'I'm looking for you all to resolve this
> thing finally.'

(Mot., Doc. 11, p. 8 at ¶ 13.c.)  The motion omits the basis for that statement:

> **THE COURT:** You told me that you thought you all had
> made some progress over the noon hour, as I understood it.

(Hr'g Tr., *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 338 at 99, lines 3-
4.)

      My statement was thus intended to *encourage* the parties to continue their
progress toward agreement and compromise, based on defense counsel's
representation to me that such progress had been made.  It was not an order to

settle.  In a case where a litigant – Joe Francis – had forthrightly rejected the alternative dispute resolution process in its first three minutes and deprived himself of the chance to benefit from the process, it was necessary and proper to assume the role of an "advocate" for mediation.   By promoting the alternative dispute resolution process, I attempted to further its objectives and those of the Eleventh Circuit, the Federal Rules of Civil Procedure, and the Local Rules of this Court:

> **THE COURT:** Local Rule 16.3 provides that mediation is a supervised settlement conference presided over by a mutual mediator to promote conciliation, compromise and the ultimate settlement of a civil action.
>
> Now the Eleventh Circuit, the Court of Appeals, has said that settlement conferences are valuable tools for district courts.
>
> . . .
>
> In fact, the Federal Rules specifically provide for settlement conferences.  In the case of the Northern District, by and large these settlement conferences are conducted by a neutral mediator rather than the district judge.
>
> . . .
>
> Now these settlement conferences and mediations are neutral forums that foster settlement – and this is the Eleventh Circuit talking – which in turn ease crowded court dockets and result in savings to the litigants and the judicial system.
>
> Second, settlement conferences allow courts to manage their dockets efficiently.  The value of the court's efficient management of its dockets cannot be underestimated.  In particular, if the court is able to adjudicate cases efficiently without much delay, it reduces the cost to the taxpayers and the expenses incurred by jurors, witnesses, parties and lawyers.

> This, in turn, creates an atmosphere more conducive to administering justice.

(Doc. 338, p. 70 at lines 13-19, 23-25, p. 71 at lines 1, 5-18.)  The Code of Judicial Conduct specifically mentions mediation and settlement as adjudicative responsibilities.  *See* Commentary to Canon 3A(5) ("A judge should encourage and seek to facilitate settlement . . ."); Canon 3A(4) ("A judge may, with consent of the parties, confer separately with the parties and their counsel in an effort to mediate or settle pending matters.").

I even emphasized to Francis how his participation in settlement discussions through mediation could possibly benefit him:

> **THE COURT:**  When I was a mediator, I would tell the parties at the beginning, that mediation will give you an opportunity to discover things about your opponent's case that you may have never thought about.  You may become aware of weaknesses that you never thought about.
>
> . . .
>
> We don't know, had Mr. Francis remained and participated constructively, that perhaps this case could have been settled for a bargain, after the mediator had had an opportunity to work with the plaintiffs.
>
> I know that Dom Caparello is one of the most tenacious mediators, and somewhere in his family tree there has to be a snapping turtle because he does not turn loose.  And he will force the most reluctant lawyer and litigant to stay into the night and focus on the down – potential downsides of their case.  And unfortunately, Mr. Francis, you did not give that process an opportunity to work so that it might have saved you from yourself.

(Hr'g Tr., *Doe v. Francis*, Case No. 5:03 cv 260, Doc. 338, p. 73 at line 25, p. 74 at

lines 1-3, p. 75 at lines 3-14.)

When the parties ultimately entered into a settlement agreement, Francis did not file a motion to vacate the settlement on the grounds that it was improperly coerced.  Nor did he contend that I dictated or influenced the terms of the settlement such that it favored the plaintiffs.  For all I know, Francis may have turned out the winner in the settlement that was reached.[7]  Francis ultimately purged his contempt, not because he settled the case, but because the settlement demonstrated that he had finally mediated in good faith.

Even assuming that the public does harbor a misperception that I required Joe Francis to settle the civil lawsuit under the threat of incarceration, Defendants fail to establish a nexus between that perception and the perception of bias that is urged.  A reasonable, objective lay observer is presumably unfamiliar with the full range of sanctions that I may lawfully impose on a litigant found to be in contempt of court.  The "settle or jail" article states that Joe Francis was found to be in contempt of court.  A lay observer reading the article could thus reasonably conclude that settlement or jail was a *proper* sanction for a contemptuous litigant like Joe Francis.  After all, it was Joe Francis' own violation of a court order, not any impetus on my part, that brought him before me.

I had no inclination to punish Francis or to cause him to "lose" the civil lawsuit.  The sanction imposed was simply intended to force Joe Francis to obey an order of this Court – my order to mediate.  A reasonable sanction for a party who fails to participate in mediation as required by court order is to require that party to "go back and do it again."

_____

[7]I have no knowledge of, nor is it generally in the business of the Court, to have knowledge of the specific terms of a settlement agreement.

Had I desired to punish Francis and to cause him to lose the civil lawsuit, I could have accomplished that objective much more swiftly and severely than ordering him to settle the case under the threat of incarceration.  The Federal Rules of Civil Procedure grant broad powers to a federal judge to insure that parties obey court orders and conduct themselves appropriately in federal proceedings.  The Federal Rules authorize me to sanction a recalcitrant defendant by (1) striking that party's defenses; (2) preventing it from opposing the claims of the plaintiffs; or (3) entering a judgment by default against it.  *See* Fed. R. Civ. P. 16(f) & 37(b)(2).  In other words, had I harbored true animosity, prejudice, or bias toward Francis and his companies, I could have simply entered orders striking every defense and entering *judgment* against them without the *need* to coerce a settlement.  *See* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1531 (2d ed. 1990) ("Undoubtedly the harshest sanction ordered is one either dismissing the plaintiff's case or entering a default judgment.")

Mindful, however, of my judicial duty to exercise my grant of authority with proper restraint, I declined to enter a default judgment, instead selecting a more judicious course:

> **THE COURT:** Financial sanctions are the low end of the available tools that are available for me to deal with this situation.  On the other end of the scale are the really capital punishment sanctions, and that would be to strike Mr. Francis' pleadings and enter a default against him.
>
> . . .
>
> [P]erhaps the sanction of entering a default against Mr. Francis is [inappropriate at this time because] he may not have been specifically warned that that might happen, although the scheduling and mediation order does generally warn of possible sanctions.

> Now this case is going to get back on track, Mr. Francis.
> And it's going to trial in July.  And how it gets to trial is
> going to depend in large measure on your behavior from
> now on.  But I want there to be no misunderstanding on
> your part that if I find willful noncompliance with the
> required procedures and my orders, that the next sanction
> is likely to be the entry of a default against you.  And then,
> as now, you will have nobody to blame but yourself.

(Hr'g Tr., *Doe v. Francis*, Case No. 5:03 cv 260, Doc. 338, p. 83 at lines 6-10, p.
84 at lines 6-18.)

　　　　To endorse the position of bias urged by Defendants would be to permit a
contemptuous litigant to wrest control of a case from a judge simply because that
litigant has chosen to perpetuate a false report by the media of a judicial
proceeding involving him.  By elevating an alleged false perception of bias – a
perception that even Girls Gone Wild does not claim to hold – above the truth,
Girls Gone Wild requests that I substitute fact with fantasy.  This the law surely
cannot and does not permit.

## 2.  Civil Contempt:  Francis Gone Wild

　　　　As further evidence of my alleged bias, the motion states that

> with regard to the behavior of Joe Francis at mediation, the
> Court stated that '[p]erhaps the next time any of us are at
> our mother's dinner table and we talk like Mr. Francis, we
> can simply tell our mother that we're just being colorful,
> and see how that flies . . . and opined that 'in all of my
> years of being a trial lawyer, and a mediator . . . I can't
> think of any worse behavior anytime in my career.'

(Mot., Doc. 11, p. 7 at ¶ 13.a.) That statement is not evidence of bias.  That
statement is the *truth*.

　　　　On March 23, 2007, the plaintiffs in *Doe v. Francis* filed a motion requesting

sanctions against Joe Francis.  *See Doe v. Francis*, Case No. 5:03cv260-RS-WCS,
Doc. 286.  The motion alleged that Francis had behaved in a threatening and
abusive manner toward the plaintiffs and their attorneys at a court-ordered
mediation.  (Doc. 286.)  Because of the seriousness of those allegations, I held a
hearing to determine whether a more formal, evidentiary hearing on the motion was
warranted.  Francis' attorney, Michael Dickey, was present at the hearing.  Mr.
Dickey stated that

> I'm not sure under the circumstances, Your Honor, what I
> could have done, or any of the other attorneys in the room
> could have done to stop [Francis'] outburst [at the
> mediation], short of what transpired, which was the
> plaintiffs' lawyers got up and left which was appropriate, I
> would put to you, under the circumstances.

(H'rg Tr., *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 311, p. 6 at lines 22-
25, p. 7 at lines 1-2.)

    In other words, Mr. Dickey, Joe Francis' attorney, agreed that the behavior of
his *own* client at a court-ordered mediation was so incredibly abusive and
inappropriate as to justify plaintiffs and their counsel to simply *leave* the mediation.
Relying on Mr. Dickey's representation, I found it appropriate to schedule an
evidentiary hearing on the motion for sanctions to afford Francis the opportunity to
defend himself.  I entered an order that unambiguously stated the purpose of the
hearing:

> Defendant Joseph R. Francis is ordered to appear . . . to
> show cause why he should not be held in contempt for
> failure to comply with Paragraph 8 of the Scheduling and
> Mediation Order and to show cause why Plaintiff's Motion
> for the imposition of sanctions should not be granted.

(*Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 289.)  Thus, the sole purpose

of the hearing, per my written order, was to consider whether Francis had violated my standard order requiring all litigants in this Court to attempt to resolve their cases through mediation.

At the evidentiary hearing, Francis was represented by Michael Burke, general counsel for Girls Gone Wild, and by Mr. Dickey.   The testimony and evidence presented at the evidentiary hearing and in the written documents filed on the docket were shocking:

• To report that Francis arrived late at the mediation is an understatement. Francis arrived *four hours* late, keeping the out-of-town plaintiffs and their attorneys waiting.  (Doc. 286, p. 1-2 at ¶¶ 1-7.)

• Francis' tardiness did not result from time spent primping; rather, Francis arrived at the mediation wearing sweat shorts, a backwards baseball cap, and was barefoot.  He was playing on an electronic devise.  (Doc. 286, p. 3 at ¶ 8.)

• As plaintiff's counsel began his presentation, Francis put his bare, dirty feet on the table, facing plaintiff's counsel.  Plaintiff's counsel said four words before Francis interrupted him.  (Doc. 286, p. 3 at ¶ 8.)

• Francis then erupted into a tantrum, yelling repeatedly: "Don't expect to get a fucking dime – not one fucking dime!" (Doc. 286, p. 3 at ¶ 9; Hr'g Tr., Doc. 338, p. 10 at lines 18-22, p. 11 at lines 19-21)

• Francis shouted:  "I hold the purse strings.  I will not settle this case at all.  I am only here because the court is making me be here!" (Doc. 286, p. 3 at ¶ 10.)

• Reasonably concluding that mediation was futile, the plaintiffs' attorneys began to leave the room.  As if he had not made his point, Francis threatened: "We will bury you and your clients!  I'm going to ruin you, your clients, and all of your ambulance-chasing partners!" (Doc. 286,  p. 3 at ¶¶ 11 & 12; Hr'g Tr., Doc. 338, p.

10 at lines 23-25, p. 11 at lines 1-10.)

    •As they exited the room, Francis, without provocation, charged plaintiffs'
counsel, "got in his face," and appeared as though he was going to physically
assault plaintiffs' counsel.  "I thought he was going to slug me," plaintiffs' counsel
testified.  (Hr'g Tr., Doc. 338, p. 12 at lines 5-10, p. 13 at lines 13-18, 23-25, p. 14
at lines 1-6, p. 18 at lines 6-9.)

    •A witness confirmed that

> it was the way – you had to be there, but it was the way that
> Mr. Francis came around the table in a very rapid motion
> and got nose to nose with [plaintiffs' counsel], was shouting
> profanities that you heard testimony about, and it seemed to
> me that he was trying to provoke a physical confrontation.

(Hr'g Tr., Doc. 338, p. 49 at lines 15-19.)

    •Francis' own attorney had to position himself between Francis and
plaintiffs' counsel to prevent a brawl.  (Hr'g Tr., Doc. 338, p. 12 at lines 13-19, p.
18 at lines 10-14, p. 49 at lines 19-21.)

    •Francis' goodbye wish to plaintiffs' counsel was "Suck my dick."  (Doc.
286, p. 4 at ¶ 15.)

    How defense counsel can reasonably question my characterization of these
events is astounding.  Michael Burke, one of Francis' attorney who was present at
the evidentiary hearing, conceded that Francis loudly uttered the offensive
statements to which plaintiffs' counsel testified.  (Hr'g Tr., Doc. 338, p. 12 at lines
5-14, 17-22.)  Burke also testified that Francis overrode his "objections" at the
mediation "to be quiet."  (Hr'g Tr., Doc. 338, p. 63 at lines 18-25, p. 64 at lines 1-
3.)  Not only had I never witnessed or experienced such vile behavior by a litigant
at a court-ordered function in my long career as an attorney and mediator, but

plaintiffs' counsel all testified that neither had *they*. (Hr'g Tr., Doc. 338, p. 14 at lines 7-12, p. 53 at lines 5-10, p. 55 at lines 15-16.)

Simply put, Francis' behavior was not mediation.  It was not posturing.  It was *violent*.  Anyone attending that mediation, including Joe Francis himself, could have been injured.  I will not permit a litigant in this *federal* court to exploit an order issued by me for the sole purpose of abusing and threatening another party. As judge, it is my responsibility to ensure the orderly administration of justice in the cases over which I preside.  *Code of Conduct for United States Judges*, Canon 3A(2) ("A judge . . . should maintain order and decorum in all judicial proceedings.")   To Joe Francis, my mediation order was apparently a conduit through which he could threaten and assault the other party and its attorneys  under the cloak of confidentiality:

> **THE COURT:**  [U]nder no stretch of the imagination can Mr. Francis' comments and his conduct be construed as being part of the mediation process.  I think, to the contrary, he made it clear unequivocally and graphically that he was not there to mediate.
>
> . . .
>
> I would characterize Mr. Francis' comments not of anything deserving or intended to foster the purposes of mediation, but rather something you might expect from a drunk fight in the parking lot of a bar at 3:00 in the morning.
>
> I find that his conduct and his statements were extreme, they were hostile, they were vulgar, they were obscene, and they are unacceptable, not only in just about every setting of our everyday life, Mr. Francis, but they are unacceptable in this court and in any activity required by this court.

(Hr'g Tr., Doc. 338, p. 73 at lines 3-6, p. 75 at lines 20-25, p. 76 at lines 1-4.)

Defendants attached as an exhibit to the motion an article published in an alternative dispute resolution journal.  *See* Michael D. Young, *Mediation Gone Wild: How Three Minutes Put an ADR Party Behind Bars*, 25 Alternatives to the High Cost of Litigation 97, 104-08 (June 2007) (Ex., Doc. 11-5.)  In that article, Young raises questions about my rulings.  Because (1) Defendants incorporate that article into their motion by attaching it as an exhibit; (2) the questions raised by Young relate to those raised by Defendants in the motion; and (3) my answers to Young's questions may further clarify my rulings, I address some of those questions below.

First, Young questions why statements and conduct made during the "mediation" were even admissible at the evidentiary hearing.  After all, Young contends, mediation is confidential

As a former mediator, I have the utmost respect for the confidentiality of the mediation process.  Indeed, my own scheduling and mediation order stated that the mediation was to be confidential.  (Doc. 243 at ¶ 8(h)) ("All discussions, representations, and statements made at the mediation conference shall be off the record and privileged as settlement negotiations.")  However, the evidence conclusively demonstrated that this so-called "mediation" was a sham.  It did not involve settlement negotiations "under [any] stretch of the imagination."   The testimony I sought at the evidentiary hearing in no way related to any confidential statements or conduct that could reasonably be characterized as "settlement negotiations."

No public policy reason exists to protect as privileged Francis' conduct.  To permit a recalcitrant litigant to shield his vile and threatening behavior at a court-

sanctioned proceeding from judicial review under the guise of confidentiality is tantamount to giving him full license to convert a benign, court-sanctioned event into an unrecognizable and dangerous fracas.  This I will not permit.

Second, Young questions the propriety of my order requiring Francis to even mediate at all.  He states that

> [i]s coercion really an appropriate goal when attempting to explore mediation as a means of resolving a litigated dispute?  What happened to mediation being a voluntary process aimed at allowing the parties to safely and creatively search for a negotiated resolution?

(Young, *supra*, at 105; Ex., Doc. 11-5 at 3.)

Fed. R. Civ. P. 16 authorizes a court to take appropriate actions to "facilitat[e] the settlement of the case."  Fed. R. Civ. P. 16(a)(5) & (c)(9). Similarly, N.D. Fla. Loc. R. 16.3(I) requires that

> [a]ll litigants in civil cases . . . shall consider the use of mediation as an alternative dispute resolution process at an appropriate stage in the litigation.  Any pending civil case may be referred to mediation by the presiding judicial officer at such time as the judicial officer may determine to be in the interests of justice.  The parties may request the court to submit any pending civil case to mediation at any time.

The federal and local rules thus impart upon the litigants and the court an *obligation* to consider and explore the use of settlement and alternative dispute resolution processes, like mediation.  The advisory committee notes to Fed. R. Civ. P. 16 explain a court's role in facilitating the resolution of cases through settlement and alternative dispute resolution processes:

> [I]t has become commonplace to discuss settlement at pretrial conferences.  Since it obviously eases crowded court

dockets and results in savings to the litigants and the judicial system, settlement should be facilitated at as early a stage of the litigation as possible . . . . A settlement conference is appropriate at any time.

. . .

In addition to settlement, Rule 16(c)(7) refers to exploring the use of procedures other than litigation to resolve the dispute. This includes urging the litigants to employ adjudicatory techniques outside the courthouse. See, for example, the experiment described in *Green, Marks & Olson, Settling Large Case Litigation: An Alternative Approach*, 11 Loyola of L.A.L.Rev. 493 (1978).

. . .

Even if a case cannot immediately be settled, the judge and attorneys can explore possible use of alternative procedures such as mini-trials, summary jury trials, *mediation*, neutral evaluation, and nonbinding arbitration that can lead to consensual resolution of the dispute without a full trial on the merits. The rule acknowledges the presence of statutes and local rules or plans that may authorize use of some of these procedures even when not agreed to by the parties. See 28 U.S.C. §§ 473(a)(6), 473(b)(4), 651-58; Section 104(b)(2), Pub. L. 101-650.

Advisory Committee Notes to Fed. R. Civ. P. 16. And "[a]lhough it is not the purpose of Rule 16(b)(7) to impose settlement negotiations on unwilling litigants, it is believed that providing a neutral forum for discussing the subject might foster it. See Moore's *Federal Practice* ¶ 16.17; 6 Wright & Miller, *Federal Practice and Procedure: Civil* § 1522 (1971)." *Id.*

If Francis had simply mediated in good faith and an impasse had resulted, he would not have been sanctioned. Indeed, many cases on this Court's dockets do not

result in settlement, and parties are not sanctioned.  Francis, however, failed to make an attempt at mediation.  Worse, he exploited the mediation process for abusive purposes.

It is important to note that neither Francis nor his attorneys filed a motion to dispense with the mediation.  Even at the evidentiary hearing on the motion for sanctions, Francis' attorneys expressed hope that settlement was a possibility.  Had Francis filed a motion to dispense with mediation, I would have considered the reasons stated in the motion, like any other motion filed on the dockets of this Court, and rendered an appropriate ruling.  Certainly, had Francis moved to dispense with mediation on the grounds that he would threaten and abuse the other party, I would have taken appropriate measures to prevent that.  This Francis and his attorneys failed to do.  Instead, Francis chose to attend the "mediation" and waste the time and money of his adversaries.  He made a mockery of himself and of the alternative dispute resolution process.

Finally, Young contemplates that "maybe [plaintiffs' motion requesting sanctions] is saying that if a party refuses to negotiate, he or she must do so politely, without being a jackass?"  I do not agree that a party is necessarily required to be "polite" at a mediation.  As a trial attorney for 32 years, I have attended numerous emotionally-charged mediations.  In cases involving deaths and serious injuries, for example, it is not uncommon, nor is it even unreasonable, for litigants to express anger toward each other or to be "impolite."  After all, litigants attend a mediation because they are involved in a *dispute*.  Thus, while it may be unreasonable to expect litigants to be "polite" to each other, it is wholly improper and unacceptable for a litigant to behave in such a way that physical violence becomes a real possibility. In other words, Francis' behavior was far worse than "impolite" – it was

dangerous.

### 3. Imprisonment - The Only Effective Coercive Sanction

Defendants next contend that a reasonable person would perceive me as biased because against them because

> [t]his Court would not to [sic] consider less onerous alternatives other than incarceration to compel compliance with an order to mediate the case and actually commented that Mr. Francis' income of $29 Million per year would render any monetary sanction ineffective.  The Court's extra-judicial knowledge of this $29 million income amount is set forth where the Court stated that it 'takes notice of the information before this court in the related criminal case involving Mantra . . . .'

(Mot., Doc. 11, p. 7 at ¶ 13b.)

Once again, that contention is inaccurate.  I considered *all* possible sanctions to compel Francis to comply with my scheduling and mediation order:

> **THE COURT:**  Now the Eleventh Circuit has said to enforce a sanctions order for a mediation or settlement conference, that the court may rely on its power to adjudicate defiant parties in civil contempt and impose sanctions ranging from fines to the striking of pleadings.
>
> . . .
>
> And the measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.  And this may – may entail the doing of a variety of acts.  When fashioning a sanction to secure compliance, the court should consider the character and magnitude of the harm threatened by the continued contumacy . . . and the probable effectiveness of any suggested sanction in bringing about the result desired.  Sanctions may be imposed to coerce the condemnor to comply with the court's order.

> And a district court has numerous options. Among them, the coercive daily fine, a compensatory fine, attorneys' fees and expenses, coercive incarceration and the striking of pleadings and entry of default. Sanctions cannot be greater than necessary to ensure compliance.

(Hr'g Tr., *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 338, p. 81 at lines 8-12, 22-25, p. 82 at lines 1-11.)

In weighing the propriety of each sanction, I determined that financial sanctions alone would not be effective in forcing Francis to obey my order:

> And because of the financial situation of Mr. Francis and his totally controlled enterprises, thoroughly documented before this court, and the related criminal case, financial sanctions alone may not be sufficient and are unlikely to cause Mr. Francis to comply with the order of this court . . . .

(Doc. 338, p. 88 at lines 21-25.) I then concluded that

> Therefore, coercive incarceration is an appropriate sanction for this situation. Mr. Francis can cure his contempt and have this sanction of incarceration removed upon his proper participation in mediation.

(Doc. 338, p. 90 at lines 9-14.)

Defendants appear to contend that it was improper for me to consider Francis' finances in fashioning an effective sanction. Defendants are mistaken. Under the Advisory Committee Notes to Fed. R. Civ. P. 16(f), "a court has discretion to impose whichever sanction it feels is appropriate under the circumstances." The judiciary does not "pick and choose" the litigants that come before it; the unique characteristics of each litigant; or the information that it acquires about each litigant during the course of judicial proceedings.

Defendants fail to cite any legal authority in support of their contention that it

was improper for me to consider the information that I *judicially* obtained about Francis' finances in determining an appropriate coercive sanction. In fact, the authority once again contradicts Defendants' position. *See In re Corrugated Container Antitrust Litigation*, 614 F.2d 958, 965 (5th Cir. 1980) ("[I]n numerous cases since the enactment of Section 455(a), courts have held that familiarity with defendants and/or the facts of a case that arises from earlier participation in judicial proceedings is not sufficient to disqualify a judge from presiding at a later trial.").[8]

The more information a court has acquired about a litigant, the more appropriate and reasonable its rulings. When a court is aware of the unique characteristics of the litigants that come before it, the less arbitrary are its decisions.

I further note that when I considered Francis' finances in determining that incarceration was the appropriate coercive sanction, Francis' attorneys did not object. Nor did they suggest an alternative sanction to incarceration:

> **MR. BURKE:** [T]he defendants might suggest . . . that if [mediation] occurs, that the contempt – civil contempt be discharged. Otherwise, if at that time the mediator refuses to certify that process has occurred, the marshals take Mr. Francis into custody per the court's order.

(H'rg Tr., *Doe v. Francis*, Case No. 5:03cv260-RS-WCS, Doc. 338, p. 99 at lines 17, 22-25 p. 100 at line 1.)

It is indeed hypocritical that the pending motion requests that I consider reports and commentary in the media – information that is not part of the judicial record – as evidence of bias but then charges that it was improper for me to consider

---

[8]In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all orders of the prior Fifth Circuit entered before October 1, 1981, as binding precedent upon all courts within the Eleventh Circuit.

information about Francis' finances – information that *was* part of the judicial record – when I determined that incarceration was an appropriate coercive sanction. Defendants cannot have it both ways.  When information benefits them, they urge me to consider it; when information does not benefit them, they urge me to reject it as improper.

In hindsight, my decision to incarcerate Francis as a coercive sanction for his failure to participate in good faith in mediation was correct.  My mistake was in attempting to accommodate Francis by staying the order of incarceration, at the urging of defense counsel.  Mr. Burke stated that an offer had been made by Francis to the plaintiffs but expressed concern that the offer "can't even be communicated, apparently to the plaintiffs.  So waiting for a response, particularly without a mediator present to certify it, could be problematic."  (Doc. 338., p. 98 at lines 2-6.).  Based on Mr. Burke's  representation, I stated:

> **THE COURT:** Let me suggest this, Mr. Burke.  We still have time today.  I will – can delay Mr. Francis surrendering to the custody of the U.S. Marshal until 4:30, and that will give you all an opportunity to meet wherever you want.
>
> . . .
>
> I'm affording you the remainder of the afternoon.  If things change, I will be here.  We'll address a new situation at that time.

(Doc. 338, p. 98 at lines 7-10, p. 102 at lines 1-3.)

At 4:30 PM, March 30, 2007, the mediator, Dominic Caparello informed me that negotiations between the parties were progressing.  At approximately 4:30 PM on March 31, 2007, Mr. Burke and plaintiffs' counsel informed me that Francis had extended an unconditional offer to the plaintiffs and that the deadline for accepting

the offer was April 3, 2007.

On April 4, 2007, Francis taught me the lesson that "no good deed goes unpunished."  Mr. Caparello reported to me that after the plaintiffs had timely accepted Francis' unconditional offer, Francis reneged on the offer by adding terms to the agreement that substantially and materially decreased the dollar amount of the offer.  In other words, even under a threat of incarceration, Francis had unlawfully revoked his unconditional offer after it had already been accepted.  Francis had also fled.

Concerned that Francis was once again defying this Court and playing games with the plaintiffs, I called an emergency hearing on April 4, 2007.  Present at the hearing was Francis' defense counsel, Mr. Dickey.  At the hearing, Mr. Dickey acknowledged that Francis had extended an unconditional offer that had been timely accepted by the plaintiffs.  Mr. Dickey stated that he was "stumped" by what had transpired.  "I thought we were really there," he reported.  (Doc. 319, p. 7 at ¶ 23.)

Even at that point, I made no attempt to enforce the settlement that had been reached.  Mindful that my proper judicial role was not to force settlements, I found instead that Francis' unconditional offer and acceptance by plaintiffs, followed by Francis' reneging on that offer, "undid all of the credit that might have been earned in terms of purging the original contempt." (Doc. 319, p. 7 at ¶ 24.)  I then ordered that Francis surrender to the custody of the United States Marshal by 12:00 PM on April 5, 2007.  (Doc. 304.)

In other words, even under a threat of incarceration, a sanction which Defendants puzzlingly characterize as far too "onerous," Francis *still* was determined to defy my orders.  Obviously, incarceration was not "onerous" *enough*

a sanction to Francis.  Francis' plot to renege on his agreement with the plaintiffs was clearly a pretextual maneuver designed once again to circumvent the judicial process; abuse the plaintiffs; and frustrate the orders of this Court.  Such conduct did not demonstrate "good faith" mediation by any conceivable definition.

## 4.  Criminal Contempt: Francis Gone Fugitive

Permanently extinguishing Defendants' contention that incarceration for civil contempt was too "onerous" a sanction, I note that Francis failed to surrender to the custody of the United States Marshal on April 5, 2007, as ordered.  (Doc. 304.)  I then issued a warrant for his arrest.  Although the Eleventh Circuit denied Francis' emergency motion to stay my order of incarceration on April 6, 2007, Francis failed to surrender on April 6.  Nor did Francis surrender on April 7, April 8, or April 9.  Francis was arrested at the Panama City-Bay County International Airport on April 10, 2007.

I charged Francis with criminal contempt for violating my order to surrender to federal custody by April 5, 2007.  (Doc. 319.)  Francis waived his right to an evidentiary hearing and pled guilty to willfully violating my order to surrender.  (Doc. 344.)   In sentencing Francis, I wrote that:

> During the five days in which Defendant Francis was a fugitive, Defendant Francis called talk shows from "undisclosed locations," undermined the authority and dignity of the Court, failed, along with his attorneys, to return calls from federal marshals about his whereabouts and whether he intended to surrender, and the spokesperson of Defendant Francis' corporation was quoted in the newspaper as stating that Defendant Francis was "very busy running a business" and that he had "no intention of honoring the court's order."

. . .

> Defendant Francis and his corporations have a history of conflicts with the law and lack of respect for authority.
>
> . . .
>
> I recognize that the law requires me to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing.  I find that the imposition of the sanction of incarceration of 35 days is necessary to vindicate the authority of the Court, to punish Defendant Francis for his disobedience, and to deter Defendant Francis and others from snubbing and undermining the authority and dignity of the judiciary.  A fine in the amount of $5,000, the maximum fine permitted for the contempt, is also necessary to reimburse the Marshal Service for the cost of locating Defendant Francis.

(Doc. 344 at 2-4.)


## 5.  Learning To Take Responsibility

The motion next states that

> In December 2006, this Court sentenced Mantra Films, Inc., for federal record keeping violations.  Although not a requirement for a corporation's sentencing, this Court required Joseph Francis to personally appear and made him read from a victim impact statement by a minor alleging alcohol use.

(Mot., Doc. 11, p. 4 at ¶ 11.)

It is mystifying how an order requiring Francis to personally appear at the sentencing of his corporation after the corporation pled guilty to a ten-count criminal information can be reasonably characterized as evidence of bias.  In my order requiring Francis to attend the sentencing, I clearly explained my reasons for

requiring his presence:

> When imposing a sentence, I am required to consider the factors in 18 U.S.C. § 3553(a). The specific factors include:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed –
>         (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.
>
> 18 U.S.C. § 3553(a)(1) and (2)(A).
>
> It is undisputed by both parties that Defendant corporation is dominated and controlled by Francis. The Plea and Cooperation Agreement states that Francis is the "founder, president, CEO, and sole shareholder of [Mantra Films, Inc.]." (Doc. 4:9 ¶ 7.) In addition, the minutes from the special meeting of the board of directors of Defendant Corporation (Doc. 3) label Francis its "sole director." It appears that the special meeting of the board of directors was convened on the eve of the change of plea hearing for the sole purpose of appointing a stand-in president to enter the guilty pleas on behalf of Defendant corporation so that Francis himself would not be inconvenienced by appearing in court and accepting responsibility.
>
>                                    . . .
>
> Having considered the nature and circumstances of the record and labeling crimes to which Defendant corporation has pled guilty and to which I have adjudicated it guilty, as well as the history and characteristics of Defendant corporation under 18 U.S.C. § 3553(a)(1), I find it appropriate that Francis – the custodian of records, founder, president, CEO, sole shareholder, sole director, and sole

> officer of Defendant corporation at the time the crimes were
> committed – must appear before this Court and represent
> Defendant corporation at the pronouncement of sentence.  I
> further find that requiring Francis' attendance at the
> sentencing hearing 'promotes respect for the law' in
> furtherance of 18 U.S.C. § 3553(a)(2)(A).

(*United States v. Mantra Films, Inc.*, Case No. 5:06cr78, Doc. 9.)

In other words, it was wholly appropriate that Francis appear at the
sentencing of his corporation.  The law recognizes that a corporation can act only
through individuals.  *See*, *e.g.*, *Union Pacific Coal Co. v. United States*, 173 F. 737,
745 (8th Cir. 1909).  In this case, Francis' corporation, Mantra Films, was his alter
ego.  Francis exercised complete and total dominion and control over the
corporation.  It was therefore proper that Francis personally attend the sentencing of
his corporation and accept responsibility for the federal crimes to which the
corporation pled guilty.

Francis had previously shirked responsibility for the crimes committed by his
corporation by formally appointing, on the eve of the guilty plea hearing, a
president of the corporation.  It was reasonable to assume that the president was
appointed for a single purpose – to appear in court and enter the plea of guilty so as
not to inconvenience Francis.

By attending the sentencing hearing, Francis should have learned a valuable
lesson:  the lesson of taking responsibility.  Had the actors been different – a
different corporation and a different custodian of records, founder, president, CEO,
sole shareholder, sole director, and sole officer of that corporation – I would have
likewise required the attendance of that person at the sentencing hearing for that
corporation. Given that Francis now complains that I should not have required him

to attend the sentencing, it appears that my efforts to counsel him on responsibility may have been for naught.

It is indeed concerning that Francis minimizes the federal crimes to which his corporation pled guilty by characterizing them as mere "record keeping violations." Congress would beg to differ. The assistant United States Attorney stated at the criminal sentencing hearing:

> **MS. MORROW:** You know, Your Honor, from the presentence report at paragraph 14, page 6, that in addition to flashing, Mantra Films would film girls, including girls as young as 17 years of age, masturbating themselves and each other, engaged in oral sex, engaged in simulated oral sex.
>
> The United States is here, Your Honor, because this corporation filmed and released footage of girls as young as 17, without doing what the law requires to protect against performers in sexually explicit conduct beneath the federal age of majority, and that is to vigilantly obtain and maintain proof that those girls did meet that federal age of majority; that they were minimally 18 years of age.
>
> . . .
>
> We're here, Your Honor, because the federal law intends to protect sometimes 17-year-olds against their own impulses; requires people like Mantra Films, and Mr. Francis, to make sure that they are old enough to do what they are being filmed doing.
>
> We ask the court to keep in mind, Your Honor, that this isn't just a one-time proverbial, big mistake. This is not just an aberration. You know, Your Honor, from Counts 1 through 3 of the indictment, there were three separate films, and two girls, both of whom submitted statements declaring to the court how this affected them. You know from the seven remaining counts . . . that there were seven different films

that had been marketed for distribution by this corporation.

So we would urge the court, Your Honor, not to simply look at this conduct of Mantra Films as merely a paperwork or a regulatory violation of the law.

(Hr'g Tr., *United States v. Mantra Films, Inc.*, Case No. 5:06cr78, Doc. 34, p. 6 at lines 11-22, p. 7 at lines 5-21.)

Francis' complaints about the unfairness of having to read a victim statement at the sentencing of his corporation are baseless as well. Because Francis apparently believes, quite disturbingly, that the minors who appeared in the videos from which he profits were at fault, not he, it was necessary and proper as the sentencing judge to attempt to challenge his thinking about the crimes to which his corporation pled guilty and for which it was about to be sentenced:

> **DEFENDANT FRANCIS:** Because these girls lied about their age, they were able to get in our videos, and that's what happened here.
>
> **THE COURT:** You know that might happen, don't you?
>
> **DEFENDANT FRANCIS:** No – well, we've implemented a lot of – I never would have dreamed this would have happened with all the – with all of the – all the things we had in place to prevent this from happening.
>
> **THE COURT:** Mr. Francis, in the last year there was a very prominently publicized study about the development of the brain of young people, and it pretty well confirmed what all of us parents know, that the judgment function of a young person's brain really doesn't get fully developed until sometime in their twenties. Doesn't take a real brave man to go out and corner some young female who has had four or five beers in the middle of spring break and convince them to do something dumb.

Now read the statement, please, so we make sure that you have read it and presumably understand it.

**DEFENDANT FRANCIS:**  We go to war at 18 years old, Your Honor, so –

**THE COURT:** Mr. Francis, read the statement.

**DEFENDANT FRANCIS:**  – I don't think those kids are dumb.

**THE COURT:** Mr. Francis, read the statement.

**DEFENDANT FRANCIS:** "As a victim affected by this crime, I have suffered both socially and psychologically.  At the young age of 17 I was manipulated and deceived and ultimately sexually exposed.  To this day I am tormented by the event and suffer from feelings of shame, guilt and even social anxiety.  Since release of the video, I have endured tremendous amounts of humiliation because of the way my friends and family saw me portrayed.  It was difficult for them to look at me the same way, and I have taken years to restore the relationships – relationships that are special and dear to me.  Years have gone by, but the memories of being sexually exploited still surface and traumatize me."

(Hr'g Tr., *United States v. Mantra Films, Inc.*, Case No. 5:06cr78, Doc. 34, p. 11 at lines 23-25, p. 12 at lines 1-25, p. 13 at lines 1-8.)  I note once again that neither Francis nor defense counsel objected to my order requiring that Francis read the victim impact statement.  In fact, later during the sentencing hearing, after Francis had read aloud the victim impact statement, defense counsel stated:

**MR. DYER:** And we understand Your Honor's concern with the impact on the victims and the role that they played.

(Hr'g Tr., *United States v. Mantra Films, Inc.*, Case No. 5:06cr78, Doc. 34, p. 15 at

lines 4-5.)  It is indeed puzzling how Francis can properly characterize, as evidence of bias, a directive from me to which he did not object and which his *own* attorney apparently agreed was proper.  Francis' frivolous attempts to insulate himself from accepting responsibility for the unlawful conduct of his corporation are appalling.

Francis also cries foul on the basis that:

> Neither the study cited by the Court, nor the allegation in the Court's statement (that Joseph Francis cornered a young female and convinced her to do something dumb) appeared in the record of that case, which was a case about record-keeping violations.  The facts were not alleged, proven by the Government, or admitted by the Defendants.

(Mot., Doc. 11, p. 4-5 at ¶ 11b.)  Again, for the reasons already set forth, Francis' efforts to minimize the crimes to which his corporation pled guilty by labeling them "record-keeping violations" is disturbing.

Further, it is telling that Francis does not complain that my comments to him were untruthful or inaccurate.  Francis simply contends that "[t]he Court's knowledge or belief that Joseph Francis was responsible for such behavior may have been the results of reading the newspaper or due to reviewing the file for a separate criminal case or a separate civil case."  (Mot., Doc. 11, p. 5 at ¶ 11c.).  Here again, when allegedly extrajudicial information is prejudicial to Francis, he urges that I reject it as improper; when such information benefits Francis, he urges that I consider it.

Based on Francis' responses to my comments, a reasonable observer could well conclude that the factual basis for the comments was accurate for two reasons.  First, I note that Francis did respond to my comments without objection from his attorneys or himself.

Second, in his responses, it is noteworthy that Francis seemed to

acknowledge the accuracy of the facts on which my opinion rested (cornering drunk women on spring break) but not my ultimate conclusion (it doesn't take a brave man to convince them to do something dumb) as demonstrated by his responses that "[w]e go to war at 18 years old," and "I don't think those kids are dumb."  In other words, by disputing my opinion but not the factual premise on which that opinion was based, a reasonable inference could be drawn that Francis agreed with the accuracy of that factual premise (that he corners drunk women on spring break). Francis' apparent position is simply that he is not responsible for the minors' behaviors because they are not "dumb" and "go to war at 18."  I cannot properly find a reasonable perception of bias where the complainant fails to dispute the accuracy of my observations both (1) at the time the comments were made and (2) in the pending motion.

In any event, I note that Francis does not contend that the actual sentence I imposed on his corporation was excessive or otherwise indicative of bias.  In fact, the sentence was affirmed on appeal.  *See United States v. Mantra Films, Inc.*, 240 Fed. Appx. 372, 2007 WL 2509852 (11th Cir. September 6, 2007) (unpublished).

As his final claim of bias, Francis states that

> The Court made similar comments on March 14, 2007, when the cameraman[, Mark Schmitz,] who had been charged for the same filming and record-keeping violation was sentenced.  This Court questioned the cameraman about whether he had a daughter.

> When the cameraman answered in the affirmative the Court stated:

> And maybe that appreciation will help you understand why society considers what you were involved with[,] with Girls Gone Wild[,] to be so reprehensible is because I think for

those of us who have had young daughters have a particular understanding of how special they can be, and if you have the idea that one of them has been hurt in any way, even though it may have been their stupidity that contributed to it, it just really – I hope you have some appreciation for it, even though the offenses that were the subject of the plea and cooperation agreement are essentially record-keeping violations; that you understand now, maybe better, that you've been involved in raising a young girl, why this seems to be so serious to so many people.

. . .

In that same hearing, the Court went on, after sentencing the cameraman to three years of probation, to explain to the cameraman that he must comply with conditions of supervision, including a special condition that he shall not commit another federal, state, or local crime during the term of probation.

When explaining that condition to the cameraman, the Court said, "That means you probably have to stay a continent away from Joe Francis."

(Mot., Doc. 11, p. 5-6 at ¶ 12a.-c.)

Again, I find that my comments were proper. My statements were intended to reflect what Schmitz had already conveyed to me earlier at his sentencing hearing:

**THE DEFENDANT:** Yes. Basically, I understand what I did was wrong, and I do apologize for that. There was – for me at the time, with working with Mr. Francis, I oversaw some moral judgments that I should have made with the type of work I was in. And I wouldn't have done that today if I had the chance to do it over, for the pure reason of the moral aspect of what I was filming.

> I did not know the girls were under age, and I would have
> never filmed them if I did know that.  But, the whole job in
> itself was not a good job, and knowing that, and knowing
> the type of person that Joe Francis was after I met him.

(Hr'g Tr., *United States v. Schmitz*, Case No. 5:06cr81, Doc. 35, p. 5 at lines 15-25.)

Thus, it was Schmitz who expressed the desire to avoid further associations
with Girls Gone Wild and Joe Francis.  My admonition to "stay a continent away
from Joe Francis" simply reflected Schmitz's own revelation.  Indeed, at the time
Schmitz was sentenced, Francis' corporation had already pled guilty to having
committed ten federal crimes.  That knowledge, in conjunction with my prior
dealings with Francis as a contemptuous litigant, reasonably justified my
admonition to Schmitz to avoid Joe Francis.  Francis would be well-served to
contemplate the following observation by Logan Pearsall Smith:  "Our names are
labels, plainly printed on the bottled essence of our past behaviors."

My comments to Schmitz about the seriousness of the offense to which he
pled guilty, like my comments to Francis, were intended to impress upon Schmitz
the gravity of the federal crime he acknowledged having committed.  My statements
reinforced the comments made earlier at Schmitz's sentencing hearing by the
Assistant United States Attorney:

> **THE COURT:**  Does the government have any comments
> about sentence?
>
> **MR. WARD:** Well, Your Honor, thank you.  Whatever can
> be said about Mr. Francis – and a lot can be said about him
> for setting this whole process in motion – it is nevertheless
> true that Mr. Schmitz was situated sort of right where the
> tire meets the road.  He was the one that was here in Panama
> City, and he was the one who actually went out and
> recruited these two underage girls, plied them with liquor to

compromise their capacity, which to some extent by their age was already compromised, persuaded them to go to the hotel room to disrobe to participate in the conduct that was depicted in the film, and in the court of that, I believe, Your Honor, he persuaded them to do things that initially they resisted doing.

And the result is, of course, that they are now on film forever more in ways that will victimize them over and over and over again.  I think the court has received a letter from one of them in a companion case to know what their feelings are about that.

So it's a very serious matter.  And that's why this statute is not just merely a regulatory statute.  It is a statute designed to protect the lives, the honor, the virtue of young women who are under age especially.

And so for that reason, although we submit the matter of sentencing to the discretion of the court, we want to make this clear on the record that we view this as a serious offense.

(Hr'g Tr., *United States v. Schmitz*, Case No. 5:06cr81, Doc. 35, p. 11 at lines 5-25, p. 12 at lines 1-6.)  My specific comment about parenthood was prompted by my dialogue with Schmitz:

**THE COURT:** Mr. Schmitz, I see that you have helped raise your fiance's daughter, is that it?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Essentially playing the role of a father?

**THE DEFENDANT:** Yes, Your Honor.  She's been with me since she was eight months old.  She's lived with me ever since.  I moved her out to Hawaii with me and we've

lived ever since together, along with my boy.

> **THE COURT:** I hope you are – have now developed some sense of the appreciation of having a daughter.

> **THE DEFENDANT:** Yes, Your Honor, I have.

> **THE COURT:** And maybe that appreciation will help you understand why society considers what you were involved with with Girls Gone Wild to be so reprehensible . . .

(Hr'g Tr., *United States v. Schmitz*, Case No. 5:06cr81, Doc. 35, p. 13 at lines 5-18.)

As the sentencing judge, it is proper that I appropriately impress upon defendants the seriousness of their offenses. When a defendant has pled guilty to a crime, the constitutional presumption of innocence evaporates. When I impose sentence, I am then required, by statute, to promote respect for the law; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A), (B) & (C). It is also my duty to state in open court the reasons for imposing each particular sentence. 18 U.S.C. § 3553(c). My conversations with Francis and Schmitz were intended to fulfill my statutory obligations.

**D. Final Statements**

The law within the courts of this circuit is clear: "[T]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Carter v. West Publ'g Co.*, 1999 U.S. App. LEXIS 38480, at *7 (11th Cir. 1999) (*quoting Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)). "[A] judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation." *United States v. Greenbough*, 782 F.2d 1556, 1558 (11th Cir. 1986); *see also United States v.*

*Cerceda*, 188 F.3d 1291, 1999 WL 716835, at *2 (11th Cir. 1999).  *See generally*
Richard E. Flamm, Judicial Disqualification § 24.2.2 (1996).  Indeed, it is my duty
as the sole district judge in the Panama City Division of this Court to preside over
the cases that are assigned to me.  N.D. Fla. Loc. R. 3.1 ("All civil cases in which
venue properly lies in a division of this district, and all criminal cases in which the
offense was committed in a division of this district, shall be filed in that division
and shall remain pending in that division until final disposition."); Code of Judicial
Conduct Canon 3(A)(2) ("A judge should hear and decide matters assigned, unless
disqualified.").

When ruling on a motion to disqualify, a judge must be ever cautious of "the
need to prevent parties from . . . manipulating the system for strategic reasons,
perhaps to obtain a judge more to their liking." *Carter*, 1999 U.S. App. LEXIS
38480 at *7-*8 (*quoting FDIC v. Sweeney*, 136 F.3d 216, 220 (1st Cir. 1998))
(internal quotation marks omitted).  The congressional framers of the
disqualification statute, § 455(a), cautioned against its misuse:

> [E]ach judge must be alert to avoid the possibility that those
> who would question his impartiality are in fact seeking to
> avoid the consequences of his expected adverse decision.
> Disqualification must have a *reasonable* basis.  Nothing in
> [the statute] should be read to warrant the transformation of
> a litigant's fear that a judge may decide a question against
> him into a "reasonable fear" that the judge will not be
> impartial.  Litigants ought not to have to face a judge where
> there is a reasonable question of impartiality, but they are
> not *entitled* to a judge of their own choice.

H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355.

To require that judges disqualify themselves unnecessarily is to encourage
litigants "to advance speculative and ethereal arguments for recusal and thus

arrogate to themselves a veto power over the assignment of judges." *Thomas v. Trustees of Columbia Univ.*, 30 F. Supp. 2d 430, 431 (S.D.N.Y. 1998).  As the Seventh Circuit has aptly observed:

> A judge who removes himself whenever a party asks is giving that party a free strike, and Congress rejected proposals . . . to allow each party to remove a judge at the party's option.

*New York City Housing Dev. Corp. v. Hart*, 796 F.2d 976, 981 (7th Cir. 1986); *see also* H.R. Rep. No. 93-1453 (1974), reprinted in 1974 U.S.C.C.A.N. 6351, 6355.

Here, every contention asserted by Defendants in support of their request for disqualification has been thoroughly addressed and laid to rest.  It is indeed ironic that Defendants state: "This Court requires all litigants before [it] to abide by strict rules of conduct and deserves the respect due to this Court.  In return, however, all litigants expect to receive the application of even-handed impartiality."  (Mot., Doc. 11, p. 17 at ¶ 53-54.)  The truth is that Defendants have failed to abide by this Court's "rules of conduct."  Defendants have not expected "to receive the application of even-handed impartiality"; rather, they have endeavored to exploit or avoid the directives of this Court in an effort to unfairly favor themselves.  They have assaulted members of the bar and the judiciary and have waged a campaign to cast shame and disrepute on this Court.

The facts speak for themselves:

1.   The motion fails to allege that I am actually biased;

2.   The motion omits the most objective evidence of my lack of bias, namely, that in every proceeding before me, counsel for Joe Francis and Girls Gone Wild did not object to; did not appeal; or appealed the rulings and comments of which they now complain and lost;

3.   The motion is the second motion filed by counsel for Francis and Girls Gone Wild charging members of the bar (and now the judiciary) with unethical conduct and seeking their disqualification;

4.   The motion incorporates, as exhibits, extrajudicial information, while preaching that such information is improper for this Court to consider;

5.   The motion warns this Court that other extrajudicial information "proliferate[s] the Internet and may be submitted to this Court upon further review";

6.   The motion distorts the legal standard required for disqualification into a contrived standard of "public perception" for the purposes of constructing a legal scaffold on which to hang Defendants' extrajudicial exhibits and poison the potential jury pool and the public's respect for the judiciary;

7.   The motion acknowledges that public perception of bias, if it even exists, is untethered to reality;

8.   The motion perpetuates, by republishing on the public dockets of this Court, a newspaper article that Defendants know to be false;

9.   The motion misrepresents the judicial record, as reflected in the official transcripts; and

10.  The motion minimizes federal crimes and the conduct of Joe Francis.

It is often said that judges must have thick skin. My skin is no different.  I do not take personally the charges of ethical misconduct that have been levied at me by Defendants in the media or in the motion.  Joe Francis is a litigant in this Court and as such, he is entitled to fair and impartial justice. All requests by Defendants and Plaintiff, like any request submitted by a litigant in a case over which I preside, will be evaluated on their legal merits, without prejudice or bias.

At the same time, it is my duty to insure that litigants obey the orders of this

Court and do not undermine the public's confidence in the integrity and impartiality of the judiciary or the rights of other parties.  An independent and honorable judiciary is indispensable to justice in our society.  Deference to the judgments and rulings of courts depends upon public trust in the integrity and independence of judges.  When a resourceful litigant, without good cause, attempts to extinguish that trust and the rights of other litigants in this Court for improper purposes, justice suffers.  Assuming that Joe Francis, Girls Gone Wild, and their attorneys play by the rules, they have no cause for concern.

## III.  Conclusion

1.   Defendants' Motion to Disqualify or Recuse Under 28 U.S.C. §  455(a) (Doc. 11) is **denied**.

2.   A scheduling order will be entered.

**ORDERED** on December 19, 2007.

/s/ Richard Smoak
**RICHARD SMOAK**
**UNITED STATES DISTRICT JUDGE**